# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**ROBERT J. KOHEL,**
                    **Plaintiff,**

    **v.**                                          **Case No. 07-C-528**

**MICHAEL ASTRUE,**
**Commissioner of the Social Security Administration,**
                    **Defendant.**

## DECISION AND ORDER

Plaintiff Robert Kohel applied for social security disability benefits, claiming that he was unable to work due to back, shoulder, hand and breathing problems. The Social Security Administration ("SSA") denied his application, as did an Administrative Law Judge ("ALJ") after a hearing. Plaintiff now seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

### A. Judicial Review

The court's task on judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. Id.

However, this does not mean that the court acts as an "uncritical rubberstamp." Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1983). In determining whether substantial evidence exists, the court must review the entire record, taking into account both evidence in support of the ALJ's conclusions and anything that fairly detracts from their weight. Young v. Sec'y of Health and Human Services, 957 F.2d 386, 388-89 (7th Cir. 1992). The court cannot let stand a decision that lacks either evidentiary support or an adequate discussion of the issues. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). Even if substantial evidence seems to support the decision, the court cannot uphold it if the ALJ skipped over important evidence, Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996), or failed to build an accurate and logical bridge between the evidence and the result, Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). Likewise, if the ALJ commits an error of law, the court "may reverse without regard to the volume of evidence in support of the factual findings." White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999). The ALJ commits such an error if he fails to abide by the SSA's regulations and rulings for evaluating disability claims. See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

**B.    Disability Standard**

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is presently working; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively disabling;[1] (4) if not, whether the claimant possesses the residual

---

[1]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

2

functional capacity ("RFC") to perform his past work;[2] and (5) if not, whether the claimant is able to perform any other work.  Skinner v. Astrue, 478 F.3d 836, 844 n.1 (7th Cir. 2007).

The claimant carries the burden of proof at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy.  Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).  The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. The ALJ may not rely on the Grid and must consult a VE if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work, although he may use the Grid as a "framework" for his decision.  E.g., Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

## II.  FACTS AND BACKGROUND

**A.     Plaintiff's Applications and Administrative Proceedings**

Plaintiff applied for benefits on March 18, 2004, alleging disability as of September 1, 1999 due to joint deterioration, back, shoulder and hand pain, and breathing problems, as well as residual problems from severe burns he suffered as a child.  He further alleged that his medications impaired his thinking and that he experienced depression and anxiety.  (Tr. at 49; 65-66; 73; 83; 88-90; 101; 111; 257.)   The SSA denied the application initially and on

---

[2]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments.  SSR 96-8p.

3

reconsideration (Tr. at 30-39; 263-70), and plaintiff requested a hearing before an Administrative Law Judge (Tr. at 42). On September 6, 2006, he appeared with counsel before ALJ John Pleuss. (Tr. at 271.)

**B.    Hearing Testimony**

**1.    Plaintiff**

Plaintiff, then fifty-one years old, testified that he was 5'11' tall and weighed 200 pounds. He indicated that he graduated high school and completed some college but did not obtain a degree. (Tr. at 275-76.) He stated that at the time he worked as a Native American spiritual leader at a campground he owned, which involved a community sweat lodge he held once a week or every couple of weeks. (Tr. at 277-78.) He testified that he received no payment for these services. (Tr. at 279.) He indicated that in the past he worked as a truck driver, construction company operator and industrial engineer. (Tr. at 280-85.)

Plaintiff testified that he suffered from chronic pulmonary obstruction and asthma for which he regularly used inhalers and a bronchial dilator. He testified that he also used a nebulizer in emergency situations, which on average occurred about once per month (more often during extreme weather), for about thirty minutes. (Tr. at 286-89.) He indicated that he experienced shortness of breath and had difficulty with airborne irritants based on these conditions. (Tr. at 289-90.)

Plaintiff further testified to low back problems for which he underwent surgery in 1987. (Tr. at 290.) He indicated that his pain persisted, and his doctor recommended a second surgery but he declined in favor of pain management and lifestyle changes. He stated that he had been taking pain medication for his back for ten years. (Tr. at 291.) He testified that his

4

back was very stiff when he awoke in the morning, and that his wife usually had to help him up. He stated that he was unable to lift and carry more than a gallon of milk, and that he could sit for about thirty minutes, stand for fifteen and walk about two blocks.  (Tr. at 292-93.)

Plaintiff also testified to an injury to his right hand, which required surgery and removal of the knuckle of his ring finger.  (Tr. at 294.)  He indicated that it hurt to make a fist and he had developed arthritis.  (Tr. at 295.)  He further testified to past surgeries to both shoulders, which relieved pain but limited his strength and range of motion.  (Tr. at 295-96.)

Finally, plaintiff indicated that he was severely burned in a fire as a child, with third degree burns over 68% of his body.  As a result he lacked sweat glands in parts of his body, which limited his ability to deal with heat and exposure to the sun.  (Tr. at 296-97.)

### 2.    VE

The VE, Richard Willette, characterized plaintiff's past work as a campground operator as light, semi-skilled; as a construction operator as medium, semi-skilled; project engineer as sedentary, skilled; and truck driver as medium, semi-skilled.  (Tr. at 299.)  He testified that the construction owner position involved skills, i.e. record keeping, transferrable to other work at the sedentary and light level.  (Tr. at 299-300.)

The ALJ then asked a hypothetical question assuming a person of plaintiff's age, education and work history, limited to light work with no more than occasional postural movement, no more than thirty continuous minutes standing or sitting, no overhead reaching or constant handling with the right hand, and no exposure to irritants or temperature extremes. The VE testified that such a person could not perform plaintiff's past work.  (Tr. at 300.) However, the person could perform other jobs such as information clerk, office helper and production clerk. (Tr. at 301.)  If the person also had to periodically but unpredictably use a

5

nebulizer for about thirty minutes to help with breathing, these jobs would essentially be eliminated. (Tr. at 302.)

## C.    Medical Evidence

### 1.    Treating Sources

On July 30, 1987, plaintiff underwent a lumbar laminectomy at L5-S1. During a follow-up visit with Dr. James Huffer on August 26, 1998, plaintiff reported continued pain and inability to lift more than ten pounds. He further reported that he planned to go back to school to study industrial engineering. On examination, plaintiff had limited range of motion and tenderness to palpation over the old incision and adjacent muscles on the left. Dr. Huffer found plaintiff to be at the end of healing, and that he had to avoid heavy lifting and protect his back from bending and twisting. (Tr. at 238.) Dr. Huffer restricted him to lifting no more than twenty pounds with no repetitive bending, twisting and other activities that stressed his back, and assigned 10% permanent partial disability to the body as a whole. (Tr. at 239.) An MRI of plaintiff's back taken on September 17, 1995, revealed central stenosis at L4-5; disc space narrowing at L5-S1 and L2-3; subligamentous disc herniation at L4-5 and L5-S1, most severe at L5-S1 with root sheath compromise on the left; facet sclerosis and hypertrophy at L2-3 on the right and some central stenosis at L4-5. (Tr. at 240-41.)[3]

In the six years prior to his application, plaintiff received his primary care from Dr. William Franks. On September 9, 1998, Dr. Franks removed a cyst from plaintiff's forehead and ordered x-rays related to plaintiff's complaint of bilateral ankle pain (Tr. at 188), which

---

[3]An August 28, 1996 pulmonary function test revealed bronchial asthma and chronic airway obstruction. (Tr. at 143.) A March 26, 1997 x-ray of plaintiff's right shoulder was negative. (Tr. at 142.)

6

came back normal (Tr. at 139).

Plaintiff returned to Dr. Franks on November 13, 1998 complaining of back pain. Plaintiff indicated that he tended to have flare-ups, which lasted several days then got better, but on this occasion his back had been worse for about ten days. On exam, Dr. Franks noted spasm of the lumbar paraspinal muscles with marked tenderness on palpation. Dr. Franks provided Flexeril. (Tr. at 188.)

In December 1998 and January 1999, Dr. Franks refilled plaintiff's medications, including Hydrocodone. On March 1, 1999, plaintiff advised Dr. Franks of anterior chest pressure not associated with exertion; Dr. Franks suggested a stress test and provided information on a cardiologist. Plaintiff returned on March 8, reporting additional episodes of chest discomfort and severe headaches. Dr. Franks suggested plaintiff take aspirin and arranged a head CT scan (Tr. at 187), which was normal (Tr. at 137). On March 22, 1999, plaintiff underwent an exercise stress test, developing mild exercise induced chest tightness associated with shortness of breath, but otherwise appearing normal. (Tr. at 136.)

In March, April and June 1999, plaintiff saw Dr. Franks for wart removal and diarrhea, and was continued on Hydrocodone. (Tr. at 186.) Dr. Franks continued plaintiff on Hydrocodone through 1999. (Tr. at 185.) On December 15, 1999, plaintiff saw Dr. Franks for a Department of Transportation physical, which was unremarkable aside from some bilateral wheezing. Dr. Franks suggested a steroid inhaler and encouraged plaintiff to quit smoking. On January 11, 2000, plaintiff returned complaining of a cough; Dr. Franks assessed bronchitis and provided a prescription for Cefzil. (Tr. at 184.) Dr. Franks continued plaintiff on Hydrocodone, and he returned to the doctor on April 20, 2000, complaining of insomnia and back pain. Dr. Franks diagnosed mild prostate hypertrophy and prescribed Flexeril. He also

7

suggested physical therapy, but plaintiff was skeptical, stating that he already knew the exercises he needed to do. (Tr. at 183.)

On June 1, 2000, plaintiff returned to Dr. Franks complaining of cough associated with significant dyspnea.[4] Dr. Franks diagnosed bronchitis with exacerbation of asthma, again advised plaintiff to quit smoking, and prescribed Augmentin and Prednisone. (Tr. at 182.) On June 4, plaintiff visited the emergency room related to his breathing problems and received a nebulizer treatment. Dr. Franks provided another nebulizer treatment on June 5, arranged for plaintiff to obtain a home nebulizer unit, and prescribed Singulair. (Tr. at 182.)

Dr. Franks continued to prescribe generic Vicodin in the summer of 2000, and plaintiff returned on September 19, 2000, noting a skin abscess under this left arm, which was resolving on its own. (Tr. at 181.) On September 28, 2000, plaintiff complained of a severe cough and increased back pain. Dr. Franks prescribed Augmentin and expected plaintiff to use his pain medication more frequently due to his back pain. (Tr. at 180.) Plaintiff returned on October 6, with persistent bronchitis and probable sinusitis, and Dr. Franks prescribed Tequin, Entex, and Phenergan with Codeine syrup. (Tr. at 180.) The problem persisted, and on October 26, Dr. Franks referred plaintiff to an ear, nose and throat specialist. On October 31, Dr. Franks provided plaintiff with samples of Wellbutrin and continued to re-fill Hydrocodone into 2001. (Tr. at 179.) Dr. Franks refilled the Wellbutrin/Zyban on March 1, 2001 (Tr. at 179),[5] and continued to refill Hydrocodone and Albuterol inhalers through August 2001 (Tr. at 178). On August 3, 2001, plaintiff asked Dr. Franks to fill out a crossbow hunting permit because he

_____

[4]Dyspnea is shortness of breath. Stedman's Medical Dictionary 556 (27th ed. 2000).

[5]Wellbutrin is an anti-depressant, Physician's Desk Reference 1579 (2006), but it appears that plaintiff used it in connection with his smoking cessation efforts.

8

was not able to pull back a regular bow based on chronic left arm weakness. (Tr. at 178.) On August 21, plaintiff reported an asthma flare-up, for which Dr. Franks prescribed Flovent. (Tr. at 178.) Dr. Franks continued to refill plaintiff's Hyrodrocone through 2001. (Tr. at 177.)

On January 8, 2002, plaintiff returned to Dr. Franks complaining of low energy, weakness, and persistent joint pain, primarily in the wrists, elbows and shoulders. His range of motion of the upper extremity joints was intact, although he complained of discomfort. (Tr. at 177.) Dr. Franks provided Vioxx for plaintiff's joint symptoms and ordered blood tests. (Tr. at 176.) The tests were fairly unremarkable, and by January 17, plaintiff reported improvement in joint pain with Vioxx. However, Dr. Franks believed plaintiff's other symptoms were suggestive of depression, and he prescribed Celexa, an anti-depressant. (Tr. at 176.) Dr. Franks also continued plaintiff on Hydrocodone and Albuterol through 2002. (Tr. at 175-76.)[6]

Plaintiff returned to Dr. Franks on February 13, 2003, complaining of decreased hearing and dyspnea. Dr. Franks could not explain the hearing problem, but prescribed Advair, a long-acting bronchodilator for plaintiff's breathing problems. (Tr. at 174.) On March 17, plaintiff complained of a cold, and Dr. Franks prescribed Phenergan with Codeine syrup. Plaintiff reported that his Advair worked satisfactorily. (Tr. at 174.) Dr. Franks refilled plaintiff's Hydrocodone in April, May, June and July. (Tr. at 173.)

On July 9, 2003, plaintiff returned to Dr. Franks complaining of worsening back pain. Examination revealed some mild discomfort to palpation in the lower lumbar area but without obvious muscle spasm. Dr. Franks arranged for x-rays (Tr. at 173), which revealed some degenerative change but no evidence of fracture or active bone legions (Tr. at 128). Dr. Franks

---

[6]On March 25, 2002, plaintiff underwent cataract surgery. (Tr. at 130-33; 176.)

9

continued plaintiff on Hydrocodone in the fall of 2003. (Tr. at 173.)

On October 15, 2003, plaintiff returned to Dr. Franks complaining of dysuria[7] associated with flank pain and right hand pain. Dr. Franks diagnosed a urinary tract infection and provided medications including Relafen. (Tr. at 172.) On October 24, plaintiff continued to complain of right hand pain. Dr. Franks increased plaintiff's Relafen and ordered an x-ray, which revealed degenerative changes to the right hand and a deformed head of the fourth metacarpal based on old trauma . (Tr. at 127; 172.) Dr. Franks arranged for plaintiff to be seen by orthopedist Dr. Joel Cler. (Tr. at 172.)

Dr. Cler examined plaintiff on November 13, 2003, suspecting rheumatoid arthritis, but plaintiff's tests came back normal. (Tr. at 146). Dr. Cler ordered an MRI of plaintiff's right hand (Tr. at 146), which revealed inflammation rather than cyst formation (Tr. at 123). Dr. Cler provided a Medrol pose pack and referred him to a rheumatologist. (Tr. at 146.) Plaintiff saw rheumatologist Dr. David Bjarnason at Marshfield Clinic on December 16, describing pain with use and difficulty with full extension and flexion. (Tr. at 152.) He indicated that past treatment with Vioxx and the Medrol provided by Dr. Cler did not help. (Tr. at 153.) Dr. Bjarnason diagnosed inflammatory arthritis of the right third MCP joint; chronic low back pain with a history of disc disease and laminectomy in 1985; shoulder pain with a history of bilateral rotator cuff surgery; numbness of the left thumb and index finger, possibly radicular in nature; and asthma. (Tr. at 154.) He proposed a synovectomy of the third right MCP. (Tr. at 154-55.)[8] Plaintiff

---

[7]Dysuria is difficulty or pain in urination. Stedman's Medical Dictionary 559 (27th ed. 2000).

[8]On December 16, 2003, plaintiff underwent a chest x-ray at Marshfield Clinic, which was essentially normal aside from evidence of previous trauma. (Tr. at 151; 157.)

10

returned to Dr. Cler on December 18, complaining of left shoulder pain, and Dr. Cler suggested an injection.  (Tr. at 145.)  On December 26, plaintiff saw Dr. Erik Torkelson, an orthopedist, at Marshfield, who suggested diagnostic synovial biopsy of the right middle finger MP joint.  In the meantime, he suggested therapy for plaintiff's hand.  (Tr. at 149-50.)  Plaintiff decided not to have the surgery due to lack of insurance.  (Tr. at 148.)

Dr. Franks continued plaintiff on Hydrocodone and Albuterol throughout 2004.  (Tr. at 170-71; 250.)  On November 17, 2004, plaintiff returned to Dr. Franks, complaining of increased dyspnea especially with exertion.  (Tr. at 250.)  Dr. Franks provided samples of Spectracef and a prescription for Prednisone.  (Tr. at 249.)  A December 14, 2004, chest x-ray revealed no definite active disease in the chest.  A lumbar x-ray taken on the same date revealed possible muscle spasm and degenerative changes at the L-3 and L5-S1 levels, with no evidence of acute fracture or active bone lesion.  (Tr. at 191.)  Dr. Franks continued plaintiff's medications through June 2005.  (Tr. at 249.)

Plaintiff returned on June 20, 2005, complaining of back pain.  Dr. Franks also noted significant wheezing related to uncontrolled asthma.  He provided Mobic, Qvar, a short course of Hydrocodone 7.5/500 and Cyclobenzaprine.  On July 5, plaintiff reported that his back pain improved until he developed severe recurrent pain while riding the lawn mower.  Dr. Franks provided additional pain medication.  (Tr. at 248.)

On August 22, 2005, plaintiff returned to Dr. Franks, reporting that his back was improved but that he still experienced low grade, chronic pain in the back, as well as the hands, elbows and shoulders.  He also complained of general fatigue.  (Tr. at 247.)  Dr. Franks ordered a chest x-ray, which revealed obstructive lung disease.  (Tr. at 246; 247.)

Dr. Franks continued to fill plaintiff's medications through 2005.  On February 9, 2006,

11

plaintiff returned complaining of increasing dyspnea with exertion. Dr. Franks provided additional samples of Qvar and a prescription for Albuterol and Spiriva. (Tr. at 245.) On March 14, 2006, plaintiff reported increased back pain, and Dr. Franks provided Cyclobenzaprine. (Tr. at 244.) Dr. Franks filled plaintiff's medications through July 2006. (Tr. at 244.)

On July 18, 2006, plaintiff returned reporting a recent exacerbation of back pain, and Dr. Franks increased his Hydrocodone and added Diazepam. (Tr. at 243.) On August 10, 2006, Dr. Franks prepared a letter indicating that plaintiff had ongoing back pain, despite his previous surgery, which limited his physical capacity to work. He also had asthma and chronic obstructive pulmonary disease with significant impairment of breathing. Finally, he experienced depression associated with insomnia. (Tr. at 251.) Plaintiff underwent an MRI on August 28, 2006, which revealed a moderate-sized disc herniation centrally and toward the left at L4-5, as well as some degenerative changes and disc bulging elsewhere. (Tr. at 253-54.)

### 2. SSA Consultants

On July 16, 2004, a state agency consulting physician, Dr. Dar Muceno, completed a physical RFC assessment form, opining that plaintiff could perform light work, i.e. lift up to twenty pounds occasionally and ten pounds frequently, stand/walk about six hours in an eight hour day, sit about six hours in an eight hour day, and push/pull in unlimited fashion. (Tr. at 159-60.) Dr. Muceno further opined that plaintiff was limited to occasional fingering/handling with the right hand and occasional overhead reaching with the left arm, and had to avoid even moderate exposure to fumes, odors, dust or gases, but that he had no postural, visual or communicative limitations. (Tr. at 161-63.)

On December 21, 2004, SSA consultant Dr. Edeson G. Damasco Ty examined plaintiff. (Tr. at 197.) Dr. Ty assessed chronic back, shoulder and hand pain, most likely secondary to

degenerative joint disease. Dr. Ty opined that plaintiff had significant limitation of his lumbar flexion and extension and could tolerate standing for only about thirty minutes with a lifting and carrying capacity of about ten pounds. (Tr. at 200-01.) His walking tolerance was about one block, which was compounded by his breathing problem. He had significant limitation with squatting and bending, and with his grip due to hand arthritis. He continued to have significant exacerbations of asthma due to non-compliance with medications secondary to financial issues. Finally, he suffered from hearing impairment likely secondary to sensorineural hearing loss. (Tr. at 201.)

On December 28, 2004, another state agency consultant, Dr. Pat Chan, completed a physical RFC assessment form, opining that plaintiff could perform light work (Tr. at 202-03), with occasional stooping (Tr. at 204), no more than frequent use of the right hand (Tr. at 205), and no work that required very fine hearing ability (Tr. at 206). Dr. Chan found no other limitations. (Tr. at 204-09.) Finally, on January 3, 2005, a consulting psychologist completed a psychiatric review technique form, opining that plaintiff had no medical determinable mental impairment. (Tr. at 210.)

**D.    ALJ's Decision**

On October 19, 2006, the ALJ issued an unfavorable decision. The ALJ determined that plaintiff had not engaged in substantial gainful activity since his alleged onset date and that he had severe impairments – asthma and degenerative disk disease – neither of which met or equaled a Listing. (Tr. at 18-19.) The ALJ found that plaintiff retained the RFC for light work involving occasional postural activities and allowing for a sit/stand option such that plaintiff would not have to sit or stand for more than thirty continuous minutes. The ALJ further found that plaintiff was precluded from constant handling and fine manipulation and any overhead

13

reaching with his right hand, and could not work around environmental irritants. (Tr. at 19.) The ALJ afforded "substantial weight" to the opinions of the state agency consultants, Drs. Chan and Muceno, in setting RFC. Finally, based on this RFC, the ALJ concluded that plaintiff could not return to past work but, relying on the VE's testimony, found that plaintiff had acquired transferrable skills from his past work and could make the adjustment to other occupations such as information clerk, officer helper and production clerk. (Tr. at 20-21.) Therefore, the ALJ concluded that plaintiff was not disabled and denied the application. (Tr. at 22.) Plaintiff requested review by the Appeals Council (Tr. at 8), but on April 12, 2007, the Council denied his request (Tr. at 5). This action followed.

### III. DISCUSSION

Plaintiff argues that the ALJ erred in (1) determining RFC, (2) adopting the state agency consultants' RFC opinions, (3) evaluating credibility and (4) finding that he had transferrable skills. I address each contention in turn.

**A.    RFC**

**1.    Legal Standard**

RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. In setting RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the claimant. Exertional capacity refers to the claimant's abilities to perform seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling. Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual

14

(seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) activities. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. The ALJ must also explain how he resolved any material inconsistencies or ambiguities in the evidence. Patterson v. Barnhart, 428 F. Supp. 2d 869, 885-86 (E.D. Wis. 2006) (citing SSR 96-8p).

 **2. Analysis**

 Plaintiff first argues that the ALJ inconsistently found that he could perform light work with a sit/stand option such that he would not have to stand or sit for more than thirty continuous minutes. He notes that light work requires a person to be on his feet about six hours in an eight-hour workday, which, he says, the ALJ's RFC would preclude. However, the ALJ found plaintiff capable of a limited range of light work, one allowing for the sit/stand option. This is not a case in which the ALJ relied on the Grid, which supposes the ability to perform a full range of work at the particular exertional level; rather, the ALJ relied on a VE at step five. See Liscano v. Barnhart, 230 F. Supp. 2d 871, 886-87 (N.D. Ind. 2002) (noting that the ALJ may not rely on the Grid and must consult a VE if the claimant cannot perform a full range of work at the relevant exertional level or has significant non-exertional limitations).

 Plaintiff next argues that, assuming he alternated between sitting and standing every thirty minutes, the ALJ's RFC would not permit even sedentary work, as such alternation would allow for sitting for a total of just four hours. See SSR 96-9p (stating that sedentary work requires the ability to sit six hours in an eight hour work day). But the ALJ did not limit plaintiff to sitting or standing for a total of four hours; nor did he require plaintiff to sit or stand for a full thirty minutes before changing positions. He instead restricted plaintiff to a limited range of

light work in which plaintiff would not be required to sit or stand for more than thirty minutes at a time. He imposed no maximum sitting or standing over the course of a workday, and his decision is not reasonably so read. Under the ALJ's RFC, plaintiff presumably could sit or stand for a few minutes, then change positions.

Finally, plaintiff argues that the ALJ failed to account for his use of a nebulizer, which he testified he used about once per month – more often in extreme weather – for thirty minutes at a time. (Tr. at 287-89.) The VE found that such a limitation would erode the job base he had identified. (Tr. at 301.) The Commissioner responds that the VE's answer assumed a person who used a nebulizer more frequently during very hot or cold weather, and the ALJ restricted plaintiff from temperature extremes. (Tr. at 19.) Thus, the Commissioner's contention seems to be that the ALJ's failure to discuss the nebulizer issue was harmless error. See Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) (noting that the harmless error doctrine applies in social security appeals).

The relevant exchange with the VE was as follows:

Q    If you add to the restrictions the Judge gave you, the, the periodic but unpredictable need to use a nebulizer to treat breathing difficulties. And that it, as I say, it's not predictable and it, it requires him to have the access to the nebulizer equipment and it takes him about 30 minutes to use and that it occurs once a month during normal times, but somewhat more frequently in below zero temperatures and or heat spells. Does that effect [sic] your opinion about the availability of jobs?

A    Well, basically what it does is if that individual would have to use that nebulizer over and above anything that would be in the normal break time or lunch time, bread [sic] periods day, yes, it would erode the job base because the person would be away from the work area and it would be considered an unscheduled break. And if they were unscheduled breaks then that would be an unreasonable accommodation and it would erode, it would erode the job base.

(Tr. at 301-02.)

Based on this exchange, it appears that the VE found significant <u>any</u> use of a nebulizer outside of normal break periods, and based on plaintiff's testimony, it appears that his use of the device "when it's [an] emergency" (Tr. at 287) could not reasonably be limited to scheduled break periods (even during normal weather). The ALJ did not have to believe plaintiff's testimony on this issue, but without some indication in the decision I cannot tell if the testimony "'was not credited or simply ignored.'" <u>Zblewski v. Schweiker</u>, 732 F.2d 75, 79 (7th Cir. 1984) (quoting <u>Cotter v. Harris</u>, 642 F.2d 700, 705 (3d Cir.1981)). Therefore, the matter must be remanded for consideration of plaintiff's use of the nebulizer. <u>See, e.g.</u>, <u>Begolke v. Astrue</u>, No. 06-C-445-C, 2007 U.S. Dist. LEXIS 41747, at *23-25 (W. D. Wis. June 7, 2007) (remanding where the ALJ failed to address the claimant's and VE's testimony on nebulizer use); <u>Quibell v. Commissioner of Social Security</u>, No. 00-10427-BC, 2004 WL 1765466, at *2-4 (E.D. Mich. July 19, 2004) (remanding where the ALJ failed to account for the claimant's apparent need for nebulizer treatments outside scheduled break times).

**B.    State Agency Consultants**

**1.    Legal Standard**

Under SSR 96-6p, the ALJ must treat the findings of state agency medical and psychological consultants as expert opinion evidence; the ALJ may not ignore these opinions and must explain the weight he gives them in his decision. Further, in evaluating such evidence, the ALJ should generally give more weight to the opinion of an examining physician than to a non-examining physician. <u>See, e.g.</u>, <u>Haynes v. Barnhart</u>, 416 F.3d 621, 631 (7th Cir. 2005); <u>Windus v. Barnhart</u>, 345 F. Supp. 2d 928, 940 (E.D. Wis. 2004); 20 C.F.R. § 404.1527(d)(1).

17

**2. Analysis**

Plaintiff argues that the ALJ (a) erred in according substantial weight to the opinions of the non-examining state agency consultants, Drs. Muceno and Chan, (b) failed to resolve a conflict between the Muceno and Chan reports, and (c) improperly evaluated the opinion of examining consultant Dr. Ty.

**a. Validity of Non-examining Consultants' Reports**

Plaintiff contends that the opinions of Drs. Muceno and Chan were not, in fact, their own medical opinions, but rather were based on the "EWS" ("electronic work sheet") compiled by non-medical personnel in the state disability determination bureau. Both physicians, in the section of the form calling for an explanation of how the evidence supported their conclusions, wrote "see EWS." (Tr. at 160; 203.) Plaintiff notes that a non-physician adjudicator is not an acceptable medical source under SSA regulations. See 20 C.F.R. § 416.913(a). He further contends that by giving substantial weight to these reports, the ALJ essentially adopted the opinions of the state bureau reviewers, depriving him of the right to a de novo hearing.

I cannot conclude that by referring to the EWS the state agency consultants deferred to non-medical personnel. Rather, it appears that the consultants referred to the evidence compiled by the state bureau, not any opinions formed by the bureau. There is no indication that Drs. Chan and Muceno did not, in fact, review the medical record themselves and form their own opinions. Further, an ALJ does not deprive a claimant of a de novo hearing by considering and relying upon the opinions of state agency medical consultants, see SSR 96-6p, particularly where there is no treating source medical opinion to the contrary, see Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004) (upholding ALJ's reliance on consultants' opinions

18

where no doctor imposed greater limitations).[9]  Finally, unless plaintiff can point to some evidence supporting greater restrictions than those adopted by the consultants (and the ALJ), any error in adopting their reports would be harmless.  See Sanchez v. Barnhart, 467 F.3d 1081, 1082-83 (7th Cir. 2006) (stating that "errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision.").  I turn now to that more important issue – whether the record contains evidence of greater restrictions which the ALJ failed to properly consider.[10]

### b.    Conflict Between Consultants' Reports

Plaintiff next argues that the ALJ failed to resolve the dispute between Drs. Muceno and Chan: the former limited plaintiff to "occasional" fingering and handling with the right hand and "occasional" reaching overhead with the left arm (Tr. at 162), while the latter limited plaintiff to

---

[9]I will say that in cases where the medical evidence is in dispute an ALJ would likely err by giving substantial weight to an opinion that offers no more explanation than "see EWS."  See 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.").

[10]Plaintiff cites Dewey v. Astrue, 509 F.3d 447 (8th Cir. 2007) in support of his argument on this point, but that case is distinguishable.  In Dewey, the ALJ "explicitly credited" the opinion of a non-physician on the mistaken belief the opinion "had been authored by a physician."  Id. at 448-49.  In the present case, the ALJ credited (actual) state agency physician opinions.  Further, in Dewey the Commissioner argued that the ALJ's error was harmless, "but in light of the presence in the record of a more restrictive opinion from Dewey's treating physician, [the court could not] say that the ALJ would inevitably have reached the same result if he had understood that the Residual Functional Capacity Assessment had not been completed by a physician or other qualified medical consultant."  Id. at 449-50.  As indicated in the text, the more important issue in the present case seems to be whether the record contains evidence of greater limitations than those imposed by the consultants.  In his reply brief, plaintiff argues that Dr. Ty provided such limitations.  I turn to that issue in § II.B.2.c. of this decision.

19

"no more than frequent" reaching, handling, fingering and feeling with the right hand (Tr. at 205). The Commissioner claims that the ALJ accepted Dr. Chan's opinion on this issue, which was reasonable given the fact that Dr. Chan had the benefit of Dr. Ty's consultative evaluation report and the lack of evidence supporting any restriction on reaching overhead with the left arm. These may be good reasons for accepting Dr. Chan's restrictions over Dr. Muceno's, but unfortunately the ALJ did not provide them. Instead, the ALJ purported to give both reports "substantial weight" without resolving the discrepancy between them. Basic "principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine [the court's] review to the reasons supplied by the ALJ." Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002).

Nevertheless, even if the ALJ erred in this regard, I may reverse only if the error was harmful. See Sanchez, 467 F.3d at 1082-83. Plaintiff admits that, of the three jobs identified by the VE, while the office helper and production clerk jobs may require frequent or constant reaching, handling and fingering, the information clerk job requires no more than occasional manipulation. Plaintiff makes no argument that the 24,470 information clerk jobs the VE identified in Wisconsin (Tr. at 301) do not constitute a "significant number" of jobs. See Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004) (stating that the Commissioner's burden at step five is "to demonstrate that the claimant can successfully perform a significant number of jobs that exist in the national economy"). Therefore, assuming plaintiff meets the other qualifications for the information clerk job, the ALJ's error in failing to resolve the contradiction between Drs. Chan and Muceno's reports was harmless.[11]

_____

[11]Plaintiff argues that he cannot perform the information clerk position because he lacks transferrable skills. I address that argument later in this decision.

20

### c.    Examining Consultant Dr. Ty's Report

Plaintiff next complains that although the ALJ mentioned Dr. Ty's consultative examination, he failed to specifically discuss Dr. Ty's statement of functional limitations or to explain the specific weight he gave Dr. Ty's opinion.  He contends that the error was harmful because, although the ALJ did appear to credit Dr. Ty's limitation on continuous standing and sitting and Dr. Ty's opinion on the need for a sit/stand option, the ALJ skipped Dr. Ty's findings of (1) "significant limitation" in lumbar extension and flexion, squatting and bending; (2) a lifting maximum of ten pounds; (3) a "significant problem" with grip strength; and (4) a walking tolerance of just one block.  Plaintiff contends that, if adopted, these limitations erode both the light and sedentary work base.

The Commissioner responds that the ALJ accounted for the first and third findings by limiting plaintiff to occasional postural movements and less than constant handling and fine manipulation with the right hand.  He further argues that the lifting and walking limitations appear to have been based on plaintiff's self-report and are unsupported by other record evidence.  Specifically, he notes that plaintiff's back surgeon limited plaintiff to twenty pounds lifting (in 1988, see Tr. at 239), and plaintiff's ability to go crossbow hunting undercuts the walking limitation.  Therefore, he contends that the ALJ was justified in rejecting these limitations.

Once again, the problem with the Commissioner's argument is that it is post hoc; the ALJ did not specifically reject (or credit) any portions of Dr. Ty's report.  Perhaps on remand the ALJ will conclude that certain of Dr. Ty's restrictions are unsupported by the record, but on the basis of the present decision I cannot make that assumption.  This is particularly true given the fact that Dr. Ty is an examining source, whose report is generally entitled to greater weight

21

than the opinions of non-examining consultants.  See <u>Windus</u>, 345 F. Supp. 2d at 940; 20 C.F.R. § 404.1527(d)(1).  Therefore, the matter must be remanded for evaluation of Dr. Ty's report.[12]  On remand, the ALJ should discuss the specific weight he gives Dr. Ty's report and the limitations it contains.

## C.    Credibility

### 1.    Legal Standard

SSR 96-7p establishes a two-step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness.  First, the ALJ must consider whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work.  SSR 96-7p.

Second, if an underlying impairment that could reasonably be expected to produce the claimant's symptoms has been shown, the ALJ must determine the extent to which the claimed symptoms limit the claimant's ability to work.  If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record.  SSR 96-7p.  The "ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence."  <u>Knight v. Chater</u>, 55 F.3d 309, 314 (7th Cir. 1995).  Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type,

---

[12]The Commissioner does not argue that plaintiff could perform the jobs identified by the VE assuming all of the limitations in Dr. Ty's report.

dosage, effectiveness and side effects of medication the claimant takes; treatment other than

medication; any other measures the claimant has used to relieve the pain or other symptoms;

and functional limitations and restrictions.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  While the

ALJ need not elaborate on each of these factors when making a credibility determination, he

must sufficiently articulate his assessment of the evidence to assure the court that he

considered the important evidence and to enable the court to trace the path of his reasoning.

Windus, 345 F. Supp. 2d at 946.  A conclusory statement that the claimant's allegations have

been considered, or are (or are not) credible will not suffice.  SSR 96-7p;  see also Lopez v.

Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003) (stating that the ALJ must articulate specific

reasons for a credibility finding, supported by record evidence).

## 2.    Analysis

In the present case, the ALJ found that plaintiff's "medically determinable impairments

could reasonably be expected to produce the alleged symptoms, but that [plaintiff's] statements

concerning the intensity, persistence, and limiting effects of these symptoms are not entirely

credible."  (Tr. at 20.)  He provided no specific explanation as to why plaintiff's testimony was

"not entirely credible,"  contrary to case law and regulation.  See Lopez, 336 F.3d at 539

(rejecting conclusory finding that testimony "was 'not fully credible'");  Beth v. Astrue, 494 F.

Supp. 2d 979, 1004 (E.D. Wis. 2007) (finding similar conclusory statement insufficient); SSR

96-7p (requiring reasons that are "sufficiently specific to make clear to the individual and to any

subsequent reviewers the weight the adjudicator gave to the individual's statements and the

reasons for that weight").  Mere citation of the regulations governing credibility, as the ALJ did

here (Tr. at 19), will not suffice.  See Schwabe v. Barnhart, 338 F. Supp. 2d 941, 955-56 (E.D.

Wis. 2004) (reversing where, although "the ALJ cited 20 C.F.R. § 404.1529 and SSR 96-7p and

23

discussed some of the relevant factors thereunder in the body of his decision . . . he never linked that discussion to his determination that plaintiff's testimony failed to support her claim of disability"). The Commissioner argues that I can infer the bases for the ALJ's finding from his discussion of the testimony and other scattered statements in the decision. However, "nothing in Social Security Ruling 96-7p suggests that the reasons for a credibility finding may be implied." Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003). Therefore, the matter must be remanded for consideration of plaintiff's credibility.[13]

## D.   Transferrable Skills

### 1.   Legal Standard

At step five of the evaluation process, the ALJ determines if the claimant can make an adjustment to other work based on his age, education and previous work experience. See, e.g., Arnold v. Barnhart, 473 F.3d 816, 821 (7th Cir. 2007). Because SSA regulations recognize that a claimant with a "skilled" work background can more successfully adapt to new

---

[13]Even if I were to scour the ALJ's decision for a credibility rationale, as the Commissioner suggests, I could not uphold the decision. The ALJ noted that in 2004, plaintiff used a riding lawn mower. (Tr. at 20.) How this is consistent with an ability to work full-time at the light exertional level is a mystery. See, e.g., Neave v. Astrue, 507 F. Supp. 2d 948, 965 (E.D. Wis. 2007) (reversing where "the ALJ relied on what appear to be fairly limited daily activities without explaining how such activities were inconsistent with plaintiff's claim"); see also Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) ("We have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home."). The ALJ also stated that plaintiff's back pain did not appreciably worsen, such that he sought medical attention, until 2003. (Tr. at 20.) A review of Dr. Franks's progress notes from 1998-2000 suggests otherwise. (See, e.g., Tr. at 180; 183; 188.) Indeed, Dr. Franks consistently prescribed Hydrocodone for plaintiff's back pain. (See, e.g., Tr. at 178.) The Commissioner states that plaintiff engaged in other activities during the period of disability, including working construction, shoveling snow and crossbow hunting. However, the ALJ did not cite these activities in his decision, and it is surely improper for a court to infer a credibility finding from activities the ALJ never even mentioned.

24

work, the ALJ considers whether the claimant acquired skills in past work that are transferable to closely related skilled or semi-skilled work with little or no vocational adjustment. Often with the assistance of a VE, the ALJ must determine if the claimant has acquired any skills in previous jobs and, if so, whether these skills are transferable and if their transfer requires any vocational adjustment. In cases decided under the Grid, the existence or non-existence of "transferability" can be decisive in resolving the issue of "disability" or "non disability." See Dennis G. Katz, Transferability of Skills Under the Medical-Vocational Guidelines Under the Social Security Act, 1998 Fed. Cts. L. Rev. 5, at *9. In other cases, such as the present one, the ALJ may rely on a VE's assessment that the claimant acquired transferable skills in identifying other jobs the claimant could perform.

SSR 82-41 explains that:

A skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn). It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner. This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery. . . .

[For example,] a semiskilled general office clerk (administrative clerk), doing light work, ordinarily is equally proficient in, and spends considerable time doing, typing, filing, tabulating and posting data in record books, preparing invoices and statements, operating adding and calculating machines, etc. These clerical skills may be readily transferable to such semiskilled sedentary occupations as typist, clerk-typist and insurance auditing control clerk.

SSA regulations further explain that:

We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

25

. . . .Transferability is most probable and meaningful among jobs in which--

(i) The same or a lesser degree of skill is required;

(ii) The same or similar tools and machines are used; and

(iii) The same or similar raw materials, products, processes, or services are involved.

. . . A complete similarity of all three factors is not necessary for transferability. However, when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, we consider that they are not transferable.

20 C.F.R. § 416.968.

## 2. Analysis

In the present case, the VE testified that plaintiff acquired the skill of "record keeping" from his past work as a construction company owner, and that such skill would transfer to office helper positions at the sedentary and light levels. (Tr. at 299-300.)[14] Plaintiff contends that "record keeping" is not a skill, but rather the mere carrying out of simple job duties without the development or application of special knowledge. Plaintiff further notes that the VE did not identify any particular characteristics of the record keeping plaintiff allegedly did, and that plaintiff in his testimony about the construction job never mentioned record keeping. (Tr. at 283-84.) Finally, plaintiff notes that even if record keeping is a skill he acquired, the VE never

---

[14]The VE testified that plaintiff also acquired transferrable skills from his past project engineer work, but he did not specify such skills. (Tr. at 300.) As plaintiff correctly notes, a transferrable skill must be specifically identified. See SSR 82-41 ("When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the . . . ALJ's decision."); see also Jones v. Barnhart, 189 F. Supp. 2d 806, 817 (N.D. Ill. 2002) (reversing where "the VE never identified the skills that would be transferable nor stated the number of jobs available to the Claimant in the national economy").

26

explained how such skills transferred to the other jobs identified.

The Commissioner responds that the ALJ is permitted to rely on the testimony of a VE on such matters, and that plaintiff offers nothing more than a contradiction of the VE's testimony with no authority. He further notes that SSR 82-41 specifically mentions record keeping as the type of skill that may transfer to other work.

At step five, the burden is on the Commissioner "'to produce or develop vocational evidence.'" Ogle v. Barnhart, 123 Fed. Appx. 361, 363 (10th Cir. 2005) (quoting Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir.1999)). In the present case, as in Ogle, the ALJ relied on the VE's testimony that plaintiff had acquired the skill of "record keeping," but there is little if any evidence about the nature of plaintiff's past work allowing a finding that he obtained such skill. The testimony concerning plaintiff's construction job was very brief (Tr. at 283-84), and the form report plaintiff completed with his application contained little more (Tr. at 78). The ALJ asked plaintiff no questions about his past construction work. "These 'skeleton description[s]' of [plaintiff's] past jobs are insufficient 'to document [his] acquisition of skills.'" Ogle, 123 Fed. Appx. at 363 (quoting Dikeman v. Halter, 245 F.3d 1182, 1185 (10th Cir. 2001)); see also Key v. Sullivan, 925 F.2d 1056, 1063 (7th Cir. 1991) (reversing where the ALJ failed to "identify work skills actually acquired by Key that would enable her to perform as he indicated, given her residual functional capacity and work experience"). Therefore, the matter must be remanded for further development on this point.[15]

_____

[15]I note that if plaintiff is found to fall in the sedentary category and not to have transferrable skills, he would be deemed disabled under Grid Rule 201.14 as of his 50th birthday. Grid Rule 201.15 provides that the same person with transferrable skills is not disabled. See Ogle, 123 Fed. Appx. at 363 (noting the significance of transferrable skills under these Rules).

27

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 1st day of February, 2008.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge